UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

4 K & D Corporation, ET AL.,

                          Plaintiffs,            13 Civ. 2527 (JGK)

              - v.-                              OPINION AND ORDER

Concierge Auctions, LLC, ET AL.,

                          Defendants.
────────────────────────────────

JOHN G. KOELTL, District Judge:

        The plaintiffs, 4 K & D Corporation d/b/a Grand Estates

Auction Company ("Grand Estates"), Deborah Jarol, and Sherwin

Jarol[1] bring this action alleging violations of the Racketeer

Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C.

§ 1961 et seq., and New York General Business Law §§ 349 and

350.  The plaintiffs also bring a claim for tortious

interference with contractual and business relationships.

        All of the claims arise out of the alleged fraudulent

business conduct of defendants Concierge Auctions, LLC

("Concierge"), Laura Brady, George Graham, Michael Russo, CA

Partners, LLC ("CA Partners"), Segue LLC ("Segue"), and Brady

Hogan Investments, LLC ("BHI").  The action alleges that

Concierge engaged in various false and deceptive practices to

obtain customers for its business of conducting auctions for

────────────

[1] Two of the original plaintiffs in this action, John Bloeser and
Nancy Bloeser, voluntarily discontinued all of their claims
against the defendants and are no longer parties to this action.

luxury homes, and that their practices damaged Grand Estates, which conducted a rival auction business. Also included as defendants are ten unnamed John/Jane Doe individuals and ten unnamed ABC Corporations. The current lawsuit also concerns actions of non-party Chad Roffers.

Because several claims arise under the RICO Act, and the state law claims are based on the same operative facts, jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1367. The defendants now move to dismiss the Amended Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The motion is **granted in part** and **denied in part**.

## I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550

U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions."  Id.  When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

## II.

The Court accepts the plaintiff's allegations in the Amended Complaint as true for purposes of this motion to dismiss.  Plaintiff Grand Estates and defendant Concierge are two auction houses directly competing against each other in the national market for luxury home auctions.  (Am. Compl. ¶¶ 48-50.)  Grand Estates is a North Carolina corporation in business since 1999 with its principal place of business in North

Carolina, while Concierge is a Florida limited liability company formed in 2008 with its principal place of business in New York, New York.  (Am. Compl. ¶¶ 16-17, 20-21).  The alleged fraudulent conduct of Concierge involved actions of the other defendants named in the Amended Complaint and non-party Roffers.

Roffers was an original managing member of Concierge at its founding in 2008 and continues to be employed by and act as an officer of Concierge.  (Am. Compl. ¶¶ 21, 27.)  Roffers's wife and mother-in-law own 95% and 5% of CA Partners, respectively, and CA Partners owns 40% of Concierge.  (Am. Compl. ¶¶ 23, 26.)[2] From the formation of Concierge in 2008 until March 2012, Roffers was employed by CA Partners and worked for Concierge as an "independent contractor" with the title of "Head of Client Services."  (Am. Compl. ¶¶ 24, 25.)

Defendant Brady is the president of Concierge.  (Am. Compl. ¶ 29.)  Brady previously worked for Roffers as a real estate broker and served as vice president of marketing at Concierge. (Am. Compl. ¶¶ 30, 56.)  Brady also owns defendant BHI, a Florida limited liability company; BHI replaced Brady as a member of Concierge as of January 2012.  (Am. Compl. ¶¶ 32, 45, 46.)

---

[2] CA Partners was also named a managing member of Concierge in the April 2010 filing with the Florida Secretary of State, but was removed in a subsequent filing in May 2010.  (Am. Compl. ¶¶ 42, 43.)

Defendant Russo is the chief operating officer of Concierge. (Am. Compl. ¶ 35.) Russo also owns defendant Segue, a limited liability company that became a member of Concierge as of January 2012. (Am. Compl. ¶¶ 37, 45, 46.)

Defendant Graham was the chief executive officer of Concierge until 2012 and was a member of Concierge as of April 2010, April 2011, and January 2012. (Am. Compl. ¶¶ 34, 42-44.) Graham's interest in Concierge was subsequently bought out, and Graham is no longer employed by Concierge. (Am. Compl. ¶¶ 34, 47.)

The plaintiffs allege that the defendants fraudulently induced sellers of luxury real estate to enter into auction contracts with Concierge by making false promises and various misrepresentations about Concierge's auction results, sales statistics, and track records, and that the defendants engaged in other fraudulent conduct such as using shill bidders, allowing bids from unregistered bidders, and adding a reserve at the last minute. (E.g. Am. Compl. ¶¶ 82-85, 87, 95-97, 114, 291-332.) As a result, Grand Estates was allegedly harmed because sellers chose Concierge instead of Grand Estates or other auction houses due to the defendants' misrepresentations to the sellers. (Am. Compl. ¶ 83.)

In addition, the plaintiffs allege that the defendants used the income from their fraudulent business practice to pay

Realogy Services Group, LLC ("Realogy") to promote Concierge's services through Realogy's subsidiary, Sotheby's International Realty ("SIR").  (Am. Compl. ¶¶ 55, 64, 66, 75, 381.)  Prior to the formation of Concierge, Roffers owned Sky Sotheby, an SIR franchisee, which allegedly experienced difficulty in the market downturn in 2008, causing Roffers to be indebted to SIR.  (Am. Compl. ¶¶ 53, 60.)  During the same year, Concierge was formed. (Am. Compl. ¶ 21.)  After Realogy terminated Sky Sotheby as a franchisee, Realogy entered into a Strategic Alliance Agreement with Concierge which named Concierge as Realogy's "preferred" auctioneer so that Concierge could perform auctions to pay back Roffers's debt to SIR.  (Am. Compl. ¶¶ 61-63.)  As a result of the agreement, SIR franchisees were instructed to refer their clients to Concierge for auction services.  (Am. Compl. ¶¶ 66, 72.)

     With respect to plaintiffs Sherwin Jarol and Deborah Jarol ("the Jarols"), the plaintiffs allege that the defendants made various misrepresentations through personal and wire communications, including statements about Concierge's experience and success rates as well as prospects for a successful sale.  (Am. Compl. ¶¶ 155, 158, 161, 162, 164.)  The Jarols then contracted with Concierge to auction their property. (Am. Compl. ¶ 166.)  In addition, the agreement between the Jarols and Concierge required that a $100,000 "break-up fee" be

placed into an escrow account to be released to Concierge if the Jarols chose to cancel the auction. (Am. Compl. ¶ 170.) After the defendants misrepresented to the Jarols the number of bidders, the auction did occur but no bids were received. (Am. Compl. ¶¶ 189-90, 192.) However, the defendants still caused the break-up fee to be released to Concierge. (Am. Compl. ¶ 203.) In addition, the plaintiffs allege that, contrary to the express direction of the Jarols, Concierge marketed the Jarols' property as a no-reserve auction and misled potential buyers that the Jarols were in financial distress and were motivated to sell. (Am. Compl. ¶¶ 173-74, 177, 207.) As a result, the Jarols allegedly suffered damages including loss of the $100,000 break-up fee and increased difficulty in subsequent attempts at selling their property. (Am. Compl. ¶¶ 116-50, 208-09.)

The plaintiffs allege that the defendants acted similarly in their handling of at least five other properties, including the property of former parties John Bloeser and Nancy Bloeser. The defendants allegedly made false representations to the owners of these properties regarding Concierge's past success and sales in order to be hired; the defendants also allegedly engaged in other fraudulent conduct such as supplying false bidder information. (Am. Compl. ¶¶ 116-50, 210-79.) In addition, the plaintiffs allege seven other instances in which

sellers were in touch with Grand Estates but eventually contracted with Concierge because of the false representations by the defendants.  (Am. Compl. ¶¶ 335-66.)

III.

The plaintiffs bring four claims under the RICO Act, 18 U.S.C. §§ 1962(a)-(d), 1964(c).  Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] may sue therefor in any appropriate United States district court."  18 U.S.C. § 1964(c). The claim for violation of § 1962(c) is asserted against defendants Graham, Russo, Brady, and CA Partners.  Under § 1962(c),

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Id. § 1962(c).  In order to state a claim under § 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) though a pattern (4) of racketeering activity."  DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)).  "Racketeering activity" encompasses, among other things, any act indictable

for crimes enumerated under 18 U.S.C. § 1961(1)(B), which include, for purposes relevant to the present case, acts of wire fraud (18 U.S.C. § 1343).  To establish a "pattern" of racketeering activity, a plaintiff must plead "at least two predicate acts, [and] show that the predicate acts are related, and that they amount to, or pose a threat of, continuing criminal activity."  Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 97 (2d Cir. 1997) (citing H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989)).  "Predicate acts are 'related' for RICO purposes when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'"  Id. (quoting H.J. Inc., 492 U.S. at 240).

### A.

The defendants first argue that the § 1962(c) claim fails because the plaintiffs have failed to allege that the RICO "enterprise" was different from the "persons" alleged to have violated § 1962(c).  A plaintiff asserting a RICO claim arising under § 1962(c) "must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name," Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158,

161 (2001), because the statute applies only to "'person[s]' who
are 'employed by or associated with' the 'enterprise.'"  Id.
(citing and quoting 18 U.S.C. § 1962(c)) (alteration in
original).  Under such a "distinctness" requirement, "a
corporate entity may not be both the RICO person and the RICO
enterprise under section 1962(c)." Riverwoods Chappaqua Corp.
v. Marine Midland Bank, N.A., 30 F.3d 339, 344 (2d Cir. 1994).
A corporation may be held liable as a RICO "person" only if "it
associates with others to form an enterprise that is
sufficiently distinct from itself." Id.

     Courts have repeatedly dismissed § 1962(c) claims alleging
that a corporation was simultaneously a RICO "person" and a RICO
"enterprise" (or part of a RICO "enterprise" from which the
corporation is not distinct). See, e.g. Cruz v. FXDirectDealer,
LLC, 720 F.3d 115 (2d Cir. 2013); Anatian v. Coutts Bank
(Switzerland) Ltd., 193 F.3d 85, 89 (2d Cir. 1999); Riverwoods,
30 F.3d at 344. In Riverwoods, the Second Circuit Court of
Appeals held that a complaint failed to state a claim under
§ 1962(c) because the plaintiffs alleged that the corporation
was a RICO "person" and that the corporation plus all its
employees and agents was the RICO "enterprise,"[3] from which the

---

[3] Indeed, in Cedric Kushner, the Supreme Court called this
"enterprise" in Riverwoods an "oddly constructed entity," and
noted that "[i]t is less natural to speak of a corporation as
'employed by' or 'associated with'" such an entity. 533 U.S. at

corporation can hardly be considered distinct.  30 F.3d at 344.
Similarly, in Cruz, a recent decision on which the defendants in
this case rely, the Court of Appeals held that the complaint's
allegations failed to satisfy the distinctness requirement in a
case in which a corporation was alleged to be a RICO "person"
conducting the deceptive practices of a RICO "enterprise" not
distinct from the corporation.  Cruz, 720 F.3d at 120-21.  After
disregarding various alleged members of the "enterprise" because
they lacked a "common purpose to engage in a particular
fraudulent cause of conduct," the Court of Appeals was left with
an "enterprise" that was alleged to consist of the corporation
itself, its parent company, its chief operating officer, and its
corporate counsel.  Id. (internal citations omitted).
Therefore, cases like Cruz and Riverwoods make it clear that, if
a plaintiff alleges a corporation to be a RICO "person" and
seeks to hold it liable for § 1962(c) violations, the RICO
"enterprise" cannot consist solely of the corporation plus its
owners and/or employees.

On the other hand, the distinctness requirement may be
satisfied if a complaint alleges a corporation itself to be the
RICO "enterprise," with its owners or employees being the RICO
"persons" conducting the affairs of the corporation through a

_____

164 (citing Riverwoods, 30 F.3d at 344).

pattern of racketeering activities.[4]  Cedric Kushner, 533 U.S. at

163.  In Cedric Kushner, a unanimous Supreme Court found a

complaint to have satisfied the distinctness requirement even

though the alleged RICO "person" was the president and sole

shareholder of the corporation which was the alleged RICO

"enterprise."  Id.  The Supreme Court reasoned that "[t]he

corporate owner/employee, a natural person, is distinct from the

corporation itself, a legally different entity with different

rights and responsibilities . . . ," id., and that § 1962(c)

does not require any more distinctness than such a legal

separation between the person and the corporate entity, id. at

165.  Subsequent cases have followed this distinction.[5]  See,

e.g., Kalimantano GmbH v. Motion in Time, Inc., 939 F. Supp. 2d

---

[4] The RICO statute imposes liability on a "person" who is
employed by or associated with an "enterprise" and conducts or
participates in the conduct of the affairs of the enterprise in
a prohibited way.  18 U.S.C. § 1962(c).  The statute does not
impose liability on the enterprise itself.  The plaintiff could
not allege a claim against a corporation as a defendant "person"
while also claiming that the corporation was the "enterprise."
That would violate the distinctness requirement.  See Jaguar
Cars, Inc. v. Royal Oaks Motor Car Co., Inc., 46 F.3d 258, 268
(3d Cir. 1995); Eldred v. Comforce Corp., No. 08 Civ. 1171, 2010
WL 812698, at *12 (N.D.N.Y. Mar. 2, 2010).
[5] Indeed, in City of New York v. Smokes-Spirits.com, Inc., 541
F.3d 425 (2d Cir. 2008), rev'd and remanded on other grounds sub
nom. Hemi Grp., LLC v. City of New York, 559 U.S. 1 (2010), the
Second Circuit Court of Appeals held that even a sole
proprietorship could be a RICO "enterprise" and satisfy the
distinctness requirement, so long as the sole proprietorship is
not "strictly a one-man show."  Id. at 448-49 (quoting and
citing McCullough v. Suter, 757 F.2d 142, 144 (7th Cir. 1985))
(internal quotation marks omitted).

392, 405 (S.D.N.Y. 2013); <u>U1IT4less, Inc. v. FedEx Corp.</u>, 896 F. Supp. 2d 275, 287-88 (S.D.N.Y. 2012) (finding sufficient distinctness "where a parent corporation and its subsidiary are alleged to be the RICO 'person,' and a separately incorporated subsidiary is alleged to be the RICO 'enterprise'").

In this case, the plaintiffs allege Concierge to be the RICO "enterprise," (Am. Compl. ¶ 12), and allege that defendants Brady, Russo, Graham, and CA Partners were RICO "persons" who "operated or otherwise managed Concierge through a pattern of racketeering activity." (Am. Compl. ¶ 411; Pls.' Mem. in Opp. to Defs.' Mot. Dismiss ("Pls.' Mem.") at 14-15.)[6] The claim under § 1962(c) is brought against these RICO persons only and not against Concierge. Therefore, it is clear that the plaintiffs do not seek to hold Concierge liable for the § 1962(c) claim as a RICO "person" but only allege that Concierge was the "enterprise." This plainly satisfies the distinctness requirement under <u>Cedric Kushner</u>. 533 U.S. at 163; <u>see also</u> <u>Kalimantano</u>, 939 F. Supp. 2d at 405; <u>U1IT4less</u>, 896 F. Supp. 2d at 287-88.

---

[6] The plaintiffs allege in the alternative that there was a RICO "enterprise-in-fact consisting of all of the Defendants" including Concierge, (Am. Compl. ¶ 413), but do not rely on that theory in their Memorandum of Law and abandoned that theory at the oral argument of the pending motion. (Tr. of Oral Argument on Oct. 31, 2013 ("Tr.") at 31-32.)

13

**B.**

To state a RICO claim, the plaintiff must allege two or more related "predicate acts" that constitute a "pattern" of racketeering activity.  Schlaifer Nance & Co., 119 F.3d at 97. A plaintiff must allege, at a minimum, that "a defendant personally committed or aided and abetted the commission of two predicate acts."  McLaughlin v. Anderson, 962 F.2d 187, 192 (2d Cir. 1992) (citing H.J. Inc., 492 U.S. at 237; Sedima, 473 U.S. at 496 n.14).  The defendants argue that the plaintiffs' allegations of predicate acts fail to satisfy the particularity requirement of Federal Rule of Civil Procedure 9(b).  The RICO predicate acts in this case consist of alleged instances of wire fraud.[7]  Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "The particularity requirement of Rule 9(b) serves to 'provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit.'"  Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004) (quoting O'Brien v. Nat'l Property Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991)).  In cases in which a plaintiff makes

---

[7] The plaintiffs also alleged an instance of bank fraud under 18 U.S.C. § 1344 as an additional predicate act, but have withdrawn that allegation.  (Tr. at 30-31.)

specific averments of fraud as predicate acts for RICO claims,
"Rule 9(b) calls for the complaint to 'specify the statements it
claims were false or misleading, give particulars as to the
respect in which plaintiffs contend the statements were
fraudulent, state when and where the statements were made, and
identify those responsible for the statements.'" Moore v.
PaineWebber, Inc., 189 F.3d 165, 173 (2d Cir. 1999) (citing and
quoting McLaughlin, 962 F.2d at 191).

The defendants argue that the plaintiffs' allegations fail
to satisfy the particularity requirement because they do not
provide the exact time and location of the statements or the
identity of the speaker.  However, the particularity requirement
is not a mechanical formula demanding exacting precision but
must instead be applied in view of its express purposes and the
facts of each case.  See Gelles v. TDA Indus., Inc., No. 90 Civ.
5133, 1991 WL 39673, at *6 (S.D.N.Y. Mar. 18, 1991) ("Rule 9(b)
does not require that a complaint plead fraud with the detail of
a desk calendar or a street map."); see also The Limited, Inc.
v. McCrory Corp., 683 F. Supp. 387, 393 (S.D.N.Y. 1988) ("The
nature and extent of the detail required will vary with the
circumstances of each case.  In general, however, defendants
must be apprised of the nature of the allegedly false
statements, by whom they were made and when, in what manner the
statements were false, how they misled plaintiff, and what

defendants obtained as a result of the alleged fraud."
(citations omitted)).

Indeed, some of the plaintiffs' allegations fall short of
the particularity requirement under Rule 9(b) because they fail
to provide any information as to the specific circumstances
constituting wire fraud.  (E.g. Am. Compl. ¶¶ 95-103.)  However,
certain other allegations have satisfied the particularity
requirement.  In particular, the plaintiffs allege material
misrepresentations in the marketing materials transmitted over
the internet in which Concierge provided false statistics and
track records regarding its past sales and history; multiple
property sellers allegedly relied on these misrepresentations in
entering into contracts with Concierge.  (E.g. Am. Compl.
¶¶ 116-29 (November 2010 pitch to sellers of 60 Round Hill
Road), 136-37 (same), 151-55 (spring 2009 pitch to the Jarols),
189-91 (same), 244 (June 2012 pitch to the property in
Mooresville, North Carolina).)  Therefore, with respect to each
of these sellers, the plaintiffs' allegations have provided
sufficient information regarding the approximate time and the
context of each of these statements to state the circumstances
constituting wire fraud.

The defendants also argue that the alleged false statements
attributed to "Concierge" do not satisfy the particularity
requirement because no specific speaker is identified.  However,

16

many of these statements appear in the marketing or pitching materials disseminated in the name of Concierge, which can properly be attributed to the business.  (E.g. Am. Compl. ¶¶ 86, 89, 112-13, 116, 121, 155, 212, 259, 269, 342.)  The plaintiffs allege that defendant Brady, as vice president of marketing and as president for Concierge, "controlled Concierge's marketing and public relations."  (Am. Compl. ¶¶ 30-31, 267.)  The plaintiffs also allege that Russo, as the chief operating officer of Concierge, "directed or otherwise knowingly caused the misrepresentations in the marketing materials to be issued by Concierge."  (Am. Compl. ¶¶ 35, 38, 267, 369.)  "[T]o constitute a [mail or wire fraud] violation . . . it is not necessary to show that [defendants] actually mailed [or wired] . . . anything themselves; it is sufficient if they caused it to be done."  Smokes-Spirits.com, 541 F.3d at 446 (alterations in original) (quoting Pereira v. United States, 347 U.S. 1, 8 (1954)).  Therefore, by alleging that Russo and Brady controlled marketing and caused false statements to be made in the name of Concierge, the plaintiffs have provided sufficient allegations regarding the persons responsible for the statements.

In addition, the plaintiffs have alleged specific instances in which defendant Russo personally made misrepresentations to the sellers over telephone, emails, and through the internet, such as the misrepresentations in connection with the auctions

of the property of former plaintiffs John and Nancy Bloeser
around November 2011 and another property in Edwards, Colorado
in 2011, (Am. Compl. ¶¶ 116, 126, 210-12).  These sellers
allegedly relied on Russo's misrepresentation in contracting
with Concierge.  (Am. Compl. ¶¶ 127, 211-12.)

Hence, the plaintiffs have sufficiently alleged that
defendants Russo and Brady directed, caused, or at least aided
and abetted multiple false statements to be made to specific
sellers by use of the wires.  Therefore, the plaintiffs'
allegations have satisfied the particularity requirement for
pleading fraud.

The defendants have not otherwise challenged the
sufficiency of the pleading of wire fraud as the pattern of RICO
predicate acts.[8]  "Where a plaintiff in a RICO claim alleges
racketeering activity based on the predicate acts of violating
the mail or wire fraud statutes, he or she must prove three
elements: (1) scheme to defraud, including proof of intent; (2)
money or property as object of scheme; (3) use of mails or wires
to further the scheme."  City of New York v. Cyco.Net, Inc., 383

---

[8] The defendants do argue that the individual Jarol plaintiffs
were not injured by a "pattern" of racketeering activity but
only by isolated transactions.  (Defs.' Mem. at 19.)  This issue
concerns the adequacy of the pleading of injury and will be
addressed in Part III.C of this Opinion.  However, the
defendants have not argued that the alleged fraudulent acts with
respect to all of the sellers as a whole, including those who
are not involved in this action, did not constitute a "pattern"
of wire fraud.

F. Supp. 2d 526, 552 (S.D.N.Y. 2005) (citing United States v.
Autuori, 212 F.3d 105, 115 (2d Cir. 2000); United States v.
Dinome, 86 F.3d 277, 283 (2d Cir. 1996)).  The plaintiffs have
stated a facially plausible claim in which defendants Russo and
Brady, through wire communications, allegedly made multiple
false representations with the intention to obtain money from
multiple property sellers in a deceptive manner; and their acts
allegedly spanned approximately three years, from 2009 to 2012.
(Am. Compl. ¶¶ 116, 151, 244); see Kalimantano, 939 F. Supp. 2d
at 404, 405 (fraudulent email advertisements sufficient for wire
fraud as RICO predicate acts); see also GICC Capital Corp. v.
Tech. Fin. Grp., Inc., 67 F.3d 463, 466-68 (2d Cir. 1995)
(discussing standard for determining whether there was a
"pattern" of racketeering activity).[9]  Therefore, the Amended
Complaint has made facially plausible allegations of wire fraud
as RICO predicate acts and a pattern of racketeering activity by
defendants Russo and Brady.

By contrast, the allegations against defendants Graham and
CA Partners are insufficient to support the assertion that each
of these defendants committed or aided and abetted at least two

_____

[9] As discussed above, the defendants have not specifically
challenged the sufficiency of the plaintiffs' pleading of a
"pattern" of racketeering activity.  Supra note 8.  Therefore,
the Court need not decide whether the alleged acts of Brady and
Russo are an "open-ended" or "closed-ended" pattern of
racketeering activity.  See GICC Capital Corp, 67 F.3d at 466-
67.

predicate acts.  With respect to defendant Graham, the plaintiffs allege only that Graham made certain false representations in a Fortune Magazine article and a Forbes.com interview.[10]  (Am. Compl. ¶¶ 300-01, 324.)  The plaintiffs have not alleged facts to show specifically that the statements were materially false or that they were intended to induce potential purchasers to use Concierge.  Therefore, the plaintiffs have failed to state a claim under § 1962(c) against defendant Graham.

With respect to defendant CA Partners, the plaintiffs seek to hold CA Partners responsible for the acts of non-party Roffers, who cannot currently be sued due to a pending bankruptcy proceeding.  (Am. Compl. ¶ 2 n.2.)  CA Partners is owned by Roffers's wife (95%) and mother-in-law (5%) and employed Roffers while he worked for Concierge as an "independent contractor."  (Am. Compl. ¶¶ 23-26.)  However, for the § 1962(c) claim, there is only a single conclusory

---

[10] The plaintiffs also allege that Concierge obtained the business of the seller of a property in Cornwall-on-Hudson with Graham's misrepresentation that a recent auction by Concierge was successful.  (Am. Compl. ¶¶ 142-43.)  However, there is no allegation as to the approximate time and manner of communication, or that wire communications were used to transmit these misrepresentations in furtherance of the plan to defraud the Cornwall-on-Hudson property owner.  Therefore, these allegations are insufficient to show an instance of wire fraud. Similarly insufficient is the bare allegation that Graham asked others to submit "stalking horse" bids, (Am. Compl. ¶ 230), which alone does not satisfy the elements of wire fraud.

allegation that "Brady, Russo, Graham, and CA Partners operated or otherwise managed Concierge through a pattern of racketeering activity." (Am. Compl. ¶ 411.)  The plaintiffs have failed to identify any specific act of CA Partners committing wire fraud, let alone establishing the commission of two or more predicate acts.  Therefore, the plaintiffs have failed to state a § 1962(c) claim against CA Partners.

### C.

Finally, plaintiffs bringing civil RICO claims must demonstrate that they each suffered an injury proximately caused by the defendants' violation of § 1962.  18 U.S.C. § 1964(c); Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992). In particular, "[w]here a RICO violation is predicated on acts sounding in fraud, a plaintiff must allege that the defendant's acts were not only the 'but for' cause of plaintiff's injury, but the proximate cause as well, necessitating 'some direct relation between the injury asserted and the injurious conduct alleged'; '[a] link that is too remote, purely contingent, or indirect is insufficient.'" Petrosurance, Inc. v. Nat'l Ass'n of Ins. Comm'rs, 888 F. Supp. 2d 491, 503-04 (S.D.N.Y. 2012) (quoting and citing Hemi Grp., LLC v. City of New York, 559 U.S. 1, 9 (2010)), aff'd, 514 F. App'x 51 (2d Cir. 2013).

Section 1964(c) provides a civil remedy only to those who

are injured "by reason of" violations of § 1962.  18 U.S.C.
§ 1964(c).  In Holmes, the Supreme Court explicitly rejected the
proposition that mere "but-for" causation would satisfy the
statutory requirement for recovery and held that the "by reason
of" language requires that the violation of § 1962 be the
"proximate cause" of the plaintiff's injury.  Holmes, 503 U.S.
at 265-68.  The Holmes Court identified three policy
considerations in evaluating whether a plaintiff's alleged harm
satisfies the "proximate cause" requirement for purposes of
civil RICO claims: (1) whether recognizing the plaintiffs'
claims would lead to a difficult task of "ascertain[ing] the
amount of a plaintiff's damages attributable to the violation,
as distinct from other, independent, factors"; (2) whether
recognizing such claims "would force courts to adopt complicated
rules apportioning damages among plaintiffs removed at different
levels of injury from the violative acts, to obviate the risk of
multiple recoveries"; and (3) whether the "directly injured
victims" can "vindicate the law as private attorneys general,
without any of the problems attendant upon suits by plaintiffs
injured more remotely."  Holmes, 503 U.S. at 269-70 (citations
omitted); see also Commercial Cleaning Servs., L.L.C. v. Colin
Serv. Sys., Inc., 271 F.3d 374, 381-82 (2d Cir. 2001).

     In this case, the plaintiffs argue that Grand Estates was
injured because the defendants' fraudulent acts gave Concierge

an unfair advantage in the competition for auction business.
(Pls.' Mem. at 18.)  The plaintiffs rely on the decision of the
Second Circuit Court of Appeals in Commercial Cleaning, 271 F.3d
374.  In that case, the court considered the three Holmes
factors discussed above to evaluate whether a competitor's RICO
claim satisfied the "proximate cause" requirement.  Id. at 381-
82 (citing Holmes, 503 U.S. at 269, 273).  The plaintiff and the
defendant were direct competitors in the laundry business, and
the defendant allegedly obtained an unfair advantage from hiring
hundreds of undocumented aliens at low wages.  Id. at 378-79.
The court reasoned that, because the plaintiff and the defendant
were direct competitors, damages were readily discoverable and
such damages did not apply to plaintiffs outside the category of
direct competitors, involving no complicated task of
ascertaining and apportioning damages.  Id. at 383.  Moreover,
actions by other parties, namely, governmental authorities
seeking to recover lost taxes and fees, would not address the
same type of harm that the defendant caused by hiring
undocumented aliens at low wages.  Id. at 385.  The Court of
Appeals noted: "There is no class of potential plaintiffs who
have been more directly injured by the alleged RICO conspiracy
than the defendant's business competitors . . . ."  Id.
Therefore, the court found that the plaintiff's claim satisfied
the "proximate cause" requirement.  Id. at 378.

This case presents a different scenario.  The plaintiffs have conceded that Grand Estates could be injured only as the result of the injury to the property sellers who were allegedly defrauded.  (Tr. of Oral Argument on Oct. 31, 2013 ("Tr.") at 26-27).  In other words, Grand Estates suffered only indirect injury that was derivative of the injury to the property sellers.  Grand Estates was injured only because the property owners were allegedly deceived into using Concierge's auction services.  In addition, Grand Estates was not the sole competitor of Concierge, even though the number of auction houses in the business of luxury estate auctions may not be large.  (Am. Compl. ¶ 48.)  Moreover, although the plaintiffs in this case name multiple instances in which property sellers were in touch with Grand Estates but eventually contracted with Concierge, there could be many reasons for which those property sellers did not choose Grand Estates, and there was no guarantee that those who contracted with Concierge would otherwise have chosen Grand Estates.  All of these factual distinctions make the present case distinguishable from Commercial Cleaning.

The Supreme Court's more recent decision in Anza v. Ideal Steel Supply Corp., 547 U.S. 451 (2006), involved a factual scenario more analogous to the present case.  In Anza, the plaintiff alleged that the defendant defrauded the New York State tax authority and thus gained an unfair advantage over the

plaintiff from being able to lower its prices.  Id. at 454.  The
Supreme Court, again applying the Holmes factors, found that the
plaintiff did not suffer an injury proximately caused by the
defendant's acts.  Id. at 458-61.  The Court reasoned that
"[b]usinesses lose and gain customers for many reasons, and it
would require a complex assessment to establish what portion of
[the plaintiff's] lost sales were the product of [the
defendant's] decreased prices."  Id. at 459.  Similarly, in this
case, because there was no assurance that property sellers would
have chosen Grand Estates had they not been allegedly defrauded
by the defendants, it is difficult to ascertain and apportion
the damage that Concierge's allegedly unfair advantage caused
specifically to Grand Estates.  See Proven Methods Seminars, LLC
v. Am. Grants & Affordable Hous. Inst., LLC, No. Civ. S-07-
01588, 2008 WL 269080, at *6 (E.D. Cal. Jan. 29, 2008)
(dismissing the defendants' RICO counterclaim for failure to
satisfy proximate cause requirement because "[t]here is simply
no basis upon which to assume that prospective consumers, absent
plaintiffs' alleged scheme [of publishing false advertisements],
would have chosen defendants' products and services as opposed
to one of the many alternatives").

    In addition, the third Holmes factor, that is, whether the
direct victims can be expected to sue, Holmes, 503 U.S. at 269-
70, also weighs against granting standing to Grand Estates.  In

Commercial Cleaning, the immediate victims of the depressed wages that also allegedly injured the plaintiff were the undocumented aliens hired by the defendant; however, it was not realistic to expect these immediate victims to bring suit against the defendant in order to remedy the harm caused by the depressed wages.  See also Commercial Cleaning, 271 F.3d at 385 (noting that actions by governmental authorities recovering lost taxes and fees would not redress the type of harm that caused the plaintiff to lose profits).  By contrast, in Anza, the harm to the plaintiff-competitor was derived from New York State's loss of tax revenues, and the State was the "immediate victim" capable of vindicating the laws against the tax fraud by pursuing the State's own claim.  Anza, 547 U.S. at 460.  In the present case, the plaintiffs concede that any injury to Grand Estates was derived from the injuries to the property sellers allegedly defrauded by the defendants.  (Tr. at 26-27.)  Any defrauded seller is presumably capable of bringing suit on his or her own: indeed, the individual plaintiffs in this case, the Jarols, are property sellers bringing their own RICO claims against the defendants.  The Bloesers also brought claims against the defendants but have discontinued those claims. Thus, it is unnecessary to find standing for Grand Estates in order to redress the injuries caused by the defendants' alleged scheme of fraud.

Therefore, Grand Estates has failed to show that the alleged RICO violations by the defendants were the proximate cause of injury to Grand Estates or that standing for Grand Estates is necessary to vindicate any sellers' claims against the defendants for the alleged fraudulent conduct.  Accordingly, Grand Estates lacks standing to bring the § 1962(c) claim.

On the other hand, the Jarols' claim plainly satisfies the "proximate injury" requirement because the Jarols were direct victims of the alleged fraud and have alleged direct injuries for which the defendants' alleged violations of § 1962(c) were the proximate cause.  The Jarols' claim also would not involve any complicated determination and apportionment of damages: the alleged damages to the Jarols were allegedly the loss of the $100,000 break-up fee and the increased difficulty in selling their house.  (Am. Compl. ¶¶ 208-09.)

The defendants argue that the Jarols have failed to allege injury "by reason of a pattern of racketeering activity," because their claims involved only "isolated" transactions.  The defendants also argue that the plaintiffs have failed to allege the necessary continuity in the predicate acts directed at the Jarols.  These arguments have no merit.  So long as a plaintiff has adequately pleaded a "pattern of racketeering activity," for purposes of damages, the plaintiff need only allege that it has suffered an injury from at least one or more of the predicate

acts comprising the RICO violation.  See Town of Kearny v. Hudson Meadows Urban Renewal Corp., 829 F.2d 1263, 1268 (3d Cir. 1987); Marshall & Ilsley Trust Co. v. Pate, 819 F.2d 806, 809-10 (7th Cir. 1987); Chevron Corp. v. Donziger, 871 F. Supp. 2d 229, 253 (S.D.N.Y. 2012); see also Terminate Control Corp. v. Horowitz, 28 F.3d 1335, 1347 (2d Cir. 1994) (stating that Kearny and Marshall & Ilsley appear to be correct, but not so holding). Hence, the Jarols have sufficiently alleged injury to proceed with their § 1962(c) claim.

Because the plaintiffs have stated a claim arising under § 1962(c) against defendants Russo and Brady but failed to state the claim against defendants Graham and CA Partners, the defendants' motion to dismiss Count III (RICO claim under § 1962(c)) is **granted** with respect to defendants Graham and CA Partners, but is **denied** with respect to defendants Russo and Brady.  In addition, because Grand Estates did not suffer an injury proximately caused by a violation of § 1962(c), the defendants' motion to dismiss Count III is **granted** with respect to the claim of plaintiff Grand Estates.  The sole remaining claim under Count III is the § 1962(c) claim by the Jarols against defendants Brady and Russo.

## IV.

The plaintiffs also bring RICO claims arising under 18

28

U.S.C §§ 1962(a), (b), and (d) against all defendants.  Section 1962(a) provides that

> [i]t shall be unlawful for any person who has received any income . . . from a pattern of racketeering activity . . . in which such person has participated as a principal . . . , to use or invest . . . any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a).  To state a claim under § 1962(a), a plaintiff must allege "(1) that the defendants used or invested racketeering income to acquire or maintain an interest in the alleged enterprise; and (2) that the plaintiffs suffered injury as a result of that investment by the defendants."  R.C.M. Exec. Gallery Corp. v. Rols Capital Co., 901 F. Supp. 630, 642 (S.D.N.Y. 1995) (citation omitted).  Thus, there must be "injury from the defendants' investment of racketeering income in an enterprise; it is not sufficient to allege injury only from the predicate acts of racketeering."  Id. (citing Ouaknine v. MacFarlane, 897 F.2d 75, 82-83 (2d Cir. 1990)).

Similarly, § 1962(b) makes it "unlawful for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."  18 U.S.C. § 1962(b).

29

Stating a claim under § 1962(b) requires an allegation of "an 'acquisition' injury, analogous to the 'use or investment injury' required under § 1962(a) . . . ." Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1063 (2d Cir. 1996) (quoting Danielsen v. Burnside-Ott Aviation Training Ctr., Inc., 941 F.2d 1220, 1231 (D.C. Cir. 1991)), vacated and remanded on other grounds, 525 U.S. 128 (1998).   The "enterprise" in §§ 1962(a) and (b) is not necessarily the racketeering enterprise in § 1962(c), but refers to an "entity purchased through moneys raised through racketeering." USA Certified Merchants, LLC v. Koebel, 262 F. Supp. 2d 319, 330-31 (S.D.N.Y. 2003).[11]

In this case, the plaintiffs allege that the defendants used the income from their racketeering activity to pay Realogy and SIR so that Realogy's subsidiary, SIR, would continue to refer business to Concierge under the Strategic Alliance Agreement.  (Am. Compl. ¶¶ 381, 398.)  The plaintiffs also allege that the defendants used their proceeds "to provide gifts including vacations to real estate brokers with whom they were seeking to do business."  (Am. Compl. ¶¶ 382, 399.)  The plaintiffs further allege that the defendants used the income to

---

[11] It is unclear from the face of the Amended Complaint what the alleged "enterprises" were--that is, enterprises in which the defendants acquired or maintained an interest or control--for purposes of the plaintiffs' §§ 1962(a) and (b) claims.  In any event, as explained below, both claims fail because the plaintiffs have failed to allege any injuries separate and distinct from those caused by the RICO predicate acts.

pay CA Partners to employ Roffers.  (Am. Compl. ¶¶ 379, 396.)
However, none of the alleged injuries to the Jarols, the other
property sellers, or to Grand Estates[12] were caused specifically
by the referral of Concierge by SIR or the real estate brokers,
or by the mere fact that Roffers was employed by CA Partners.
Instead, as the Amended Complaint indicates, these injuries were
all caused by the alleged misrepresentations by the defendants,
that is, the predicate acts of wire fraud.  (E.g. Am. Compl.
¶¶ 150, 206, 272, 352.)  Such allegations of injuries caused by
the predicate acts themselves are insufficient to state a claim
under §§ 1962(a) and (b).  See, e.g., Moses v. Martin, 360 F.
Supp. 2d 533, 544 (S.D.N.Y. 2004); Dornberger v. Metro. Life
Ins. Co., 961 F. Supp. 506, 527 (S.D.N.Y. 1997).

The plaintiffs further allege that defendants CA Partners,
Segue, and BHI used the racketeering income "to purchase the
interests in Concierge from Graham and Mattison."  (Am. Compl.
¶¶ 380, 397.)  But the plaintiffs have failed to allege any
injury that was caused by this purchase of interests in

---

[12] The defendants have argued that Grand Estates's alleged injury
failed to satisfy the "proximate cause" requirement only in the
context of the § 1962(c) claim.  (Defs.' Mem. at 15-18.)
However, the "proximate cause" requirement is not specific to
§ 1962(c) but is rooted in the language of § 1964(c), which
creates the cause of action for all civil RICO claims.  Holmes,
503 U.S. at 268.  Therefore, Grand Estates's §§ 1962(a) and (b)
claims should be dismissed because these claims, like Grand
Estates's § 1962(c) claim, fail to satisfy the "proximate cause"
requirement.  Supra Part III.C.

Concierge.  If the defendants simply invested the income derived from a fraudulent scheme "in the same enterprise alleged to have been the vehicle through which Defendants engaged in the unlawful predicate act[s]," Koebel, 262 F. Supp. 2d at 331, the acquisition or maintenance of interest in or control of the enterprise could not have caused any injury that was separate and distinct from the injury caused by the predicate acts; under such circumstances, the plaintiff has no cause of action under §§ 1962(a) and § 1962(b).  Koebel, 262 F. Supp. 2d at 331; see also United States Fire Ins. Co. v. United Limousine Serv., Inc., 303 F. Supp. 2d 432, 449-50 (S.D.N.Y. 2004).  In this case, because Concierge was allegedly the vehicle of the defendants' alleged racketeering activity, any purchase of interest in Concierge, such as the purchase from Graham and Mattison, could not have caused any harm that was separate and distinct from the injury caused by the predicate acts.

Therefore, because the plaintiffs have not alleged any injury separate and apart from the injury caused by these predicate acts, the plaintiffs have failed to state a claim under §§ 1962(a) and (b), and the defendants' motion to dismiss Counts I and II is **granted**.


Finally, § 1962(d) prohibits any conspiracy to violate §§ 1962(a)-(c).  18 U.S.C. § 1962(d).  Other than one conclusory

32

allegation that the defendants "agreed" to commit the violations, (Am. Compl. ¶ 418), the plaintiffs have alleged no facts to show specifically that the defendants had any "meeting of the minds" in the alleged violations.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim.  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555); see also United States Fire Ins. Co., 303 F. Supp. 2d at 453-54; Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young, No. 91 Civ. 2923, 1994 WL 88129, at *30 (S.D.N.Y. Mar. 15, 1994) ("[N]umerous district courts within this circuit have dismissed conclusory allegations of agreement as insufficient to state a RICO conspiracy claim.") (citing cases); FD Prop. Holding, Inc. v. U.S. Traffic Corp., 206 F. Supp. 2d 362, 373-74 (E.D.N.Y. 2002) (finding a general allegation that "each of these defendants agreed to commit each of the two or more predicate acts" insufficient to state a claim for RICO conspiracy under § 1962(d)).

Nor can the plaintiffs establish conspiracy based on the lone allegation that, "[a]s Concierge is a small company, the [individual defendants] work interchangeably, with each of them taking part in the control and direction of Concierge."  (Am. Compl. ¶ 369; Pls.' Mem at 23.)  Such a general allegation about the structure of the business is not sufficient to establish

that each defendant consciously agreed to commit the specific predicate acts.  See Black Radio Network, Inc. v. NYNEX Corp., 44 F. Supp. 2d 565, 581 (S.D.N.Y. 1999) ("To state a claim under § 1962(d) plaintiffs must allege facts that support a conclusion that defendants consciously agreed to commit predicate acts."). Accordingly, the plaintiffs have failed to state a claim under § 1962(d), and the defendants' motion to dismiss Count IV is **granted.**

**V.**

The plaintiffs also bring claims under New York State law. Although Grand Estates is dismissed as a plaintiff from the only remaining federal law claim arising under 18 U.S.C. § 1962(c), Grand Estates's state law claims have a close relationship to the § 1962(c) claim because they are based on the same alleged acts constituting wire fraud.  Therefore, Grand Estates's state law claims "form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a); see also Brazinski v. Amoco Petroleum Additives Co., 6 F.3d 1176, 1181-82 (7th Cir. 1993) (upholding supplemental jurisdiction in a case in which one of the plaintiffs had only a state law claim that was closely related to the other plaintiffs' federal law claim).  None of the circumstances listed under 28 U.S.C. § 1367(c) apply in this case to weigh

34

against the Court's exercising supplemental jurisdiction.
Accordingly, the Court retains supplemental party jurisdiction
over the state law claims of Grand Estates.

## VI.

The plaintiffs bring a claim for tortious interference
under New York State law, alleging both interference with
contract and interference with business relationships. (Am.
Compl. ¶ 433.) However, the plaintiffs' Memorandum of Law fails
to address the argument of tortious interference with contract,
and that aspect of the claim is therefore abandoned, see, e.g.,
Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 704
n.19 (S.D.N.Y. 2011); Katz v. Image Innovations Holdings, Inc.,
542 F. Supp. 2d 269, 275 (S.D.N.Y. 2008), leaving only the claim
for tortious interference with business relationships.

Under New York law, to establish a claim for tortious
interference with a business relationship, "a party must prove
1) that it had a business relationship with a third party;
2) that the defendant knew of that relationship and
intentionally interfered with it; 3) that the defendant acted
solely out of malice or used improper or illegal means that
amounted to a crime or independent tort; and 4) that the
defendant's interference caused injury to the relationship with
the third party." Amaranth LLC v. J.P. Morgan Chase & Co., 888

N.Y.S.2d 489, 494 (App. Div. 2009).

In this case, the plaintiffs point to several instances in which potential sellers had a contact with Grand Estates but eventually contracted with Concierge after being offered false information by Concierge. (Pls.' Mem. at 25-27.) However, even if those allegations were sufficient to show the existence of business relationships, the plaintiffs have not alleged any fact showing that the defendants knew of the sellers' relationships with Grand Estates--much less that the defendants intentionally interfered with such relationships.

The plaintiffs argue that the defendants' knowledge of these relationships can be "inferred," (Tr. at 35), because the defendants were aware that they were in competition with other auction houses including Grand Estates, and that "in misrepresenting their success[, the defendants] would deprive [Grand Estates] and other legitimate auction companies of business." (Pls.' Mem. at 26.) However, it is clear that, in order to state a claim for tortious interference, there must be a particular business relationship between the plaintiff and the third party, that defendants must have actual knowledge of that specific relationship, and that the interference must be intentional, not negligent. See Balance Point Divorce Funding, LLC v. Scranton, --- F. Supp. 2d ---, No. 13 Civ. 1049, 2013 WL 5718456, at *7 (S.D.N.Y. Oct. 21, 2013), as corrected (Oct. 31,

2013) ("To bring a claim of tortious interference with business relations, . . . [t]he allegation that the defendant had actual knowledge of the relationship in issue is an essential element of the claim." (Citations omitted)); see also 800America, Inc. v. Control Commerce, Inc., 202 F. Supp. 2d 288, 290 (S.D.N.Y. 2002); Yong Ki Hong v. KBS Am., Inc., --- F. Supp. 2d ---, No. 05 Civ. 1177, 2013 WL 5366388, at *15 (E.D.N.Y. Sept. 24, 2013) ("A generalized allegation . . . will not pass muster; plaintiffs must show that defendants had actual knowledge of the specific business relationships with which they allegedly interfered."). Therefore, because the Amended Complaint fails to provide any factual allegations that the defendants had actual knowledge of any specific business relationships between Grand Estates and a potential seller or that the defendants intentionally interfered with that business relationship, the plaintiffs have failed to state a claim for tortious interference with a business relationship. See Sedona Corp. v. Ladenburg Thalmann & Co., No. 03 Civ. 3120, 2009 WL 1492196, at *9 (S.D.N.Y. May 27, 2009) (dismissing the tortious interference claim because the complaint failed to "allege that Defendants knew about the specific business relationships identified in the [complaint]"). Accordingly, the defendants' motion to dismiss Count VI is **granted**.

37

**VII.**

The plaintiffs bring two claims under New York General Business Law §§ 349 and 350.  Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a).  Section 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."  Id. § 350. For a claim under Section 349 or Section 350, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice."  City of New York v. Smokes-Spirits.Com, Inc., 911 N.E.2d 834, 838 (N.Y. 2009); see also Koch v. Acker, Merrall & Condit Co., 967 N.E.2d 675, 675 (N.Y. 2012).

In addition, Sections 349 and 350 contain a "territoriality" requirement: to state a claim under either provision, the deception of consumers must occur in New York. Goshen v. Mut. Life Ins. Co. of N.Y., 774 N.E.2d 1190, 1194-96 (N.Y. 2002); Cruz, 720 F.3d at 124 (applying the territoriality requirement to both § 349 and § 350).  The New York Court of Appeals explained in Goshen that "[t]he reference in section 349(a) to deceptive practices in 'the conduct of any business, trade or commerce or in the furnishing of any service in this

state' (emphasis added) unambiguously evinces a legislative intent to address commercial misconduct occurring within New York." Id. Similarly, Section 350 contains a parallel language prohibiting "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state," N.Y. Gen. Bus. Law § 350 (emphasis added), and "[t]he standard for recovery under . . . § 350, while specific to false advertising, is otherwise identical to section 349," Goshen, 774 N.E.2d at 1195 n.1. Therefore, Section 350 has the same territorial requirement as Section 349, requiring deception in New York. See id. at 1196; Berkman v. Robert's Am. Gourmet Food, Inc., 841 N.Y.S.2d 825, 2007 WL 1815990, at *5 (Sup. Ct. 2007); see also Cruz, 720 F.3d at 124; Leider v. Ralfe, 387 F. Supp. 2d 283, 292 (S.D.N.Y. 2005). Thus, to state a claim under either Section 349 or Section 350, the plaintiffs must show, at the very least, that the deceptive transaction occurred in New York in order to satisfy the territorial requirement. Cruz, 720 F.3d at 123-24.

With respect to the Jarols' claims, the plaintiffs argue that the territorial requirement is satisfied based on the fact that Concierge's contract with the Jarols contains a choice-of-law provision and a forum-selection clause requiring that any dispute relating to the contract be resolved in courts located in New York and under New York law. (Wolf Decl. Ex. C ¶ 17.)

However, even though choice-of-law and forum-selection
provisions may be indicative of a transaction in New York when
other factors are present, see Cruz, 720 F.3d at 123-24, the
mere fact that parties agreed to be bound by New York law and to
resolve their disputes in courts in New York does not, in
itself, provide any indication as to where a transaction
occurred.  There are no allegations in the Amended Complaint
showing that the underlying transaction between Concierge and
the Jarols occurred in New York.  Indeed, the plaintiffs
themselves have conceded that the Jarols were not injured in New
York.  (Tr. at 33.)

Nevertheless, the plaintiffs argue that the Jarols, who
were selling a property in Illinois, were "injured as a result
of dissemination of information from New York."  (Tr. at 33;
Pls.' Mem. at 24.)  In Goshen, the New York Court of Appeals
rejected precisely this type of allegation as insufficient to
satisfy the territoriality requirement, holding that "'hatching
a scheme' or originating a marketing campaign in New York in and
of itself" does not constitute an actionable deceptive act in
New York State, Goshen, 774 N.E.2d at 1195; instead, "the
transaction in which the consumer is deceived must occur in New
York."  Id.  Therefore, the GBL §§ 349 and 350 claims of the
Jarols must be dismissed.

Moreover, the GBL claims of both the Jarols and Grand

Estates fail because the plaintiffs have not alleged facts to
show that Concierge's conduct was "consumer-oriented," which is
a required element of the GBL claims.[13]   Koch, 967 N.E.2d at 675.
Courts in New York have held repeatedly that a "'single shot
transaction' involving complex arrangements, knowledgeable and
experienced parties and large sums of money" is not a "consumer-
oriented" transaction for purposes of GBL claims.   Genesco
Entm't v. Koch, 593 F. Supp. 743, 752 (S.D.N.Y. 1984) (Weinfeld,
J.); accord Oswego Laborers' Local 214 Pension Fund v. Marine
Midland Bank, N.A., 647 N.E.2d 741, 744-45 (N.Y. 1995); 904

---

[13] The defendants argue that Grand Estates cannot bring claims
under Sections 349 and 350 because it did not suffer any direct
injury.  (Defs.' Mem. at 25.)  However, New York law permits a
competitor to sue under Sections 349 and 350 if the alleged
deceptive acts result in consumer injury and affect the public
interest in New York.  N. State Autobahn, Inc. v. Progressive
Ins. Grp. Co., 953 N.Y.S.2d 96, 106 (App. Div. 2012) (affirming
a competitor's standing under Sections 349 and 350); see also
Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d
Cir. 1995).  Nevertheless, courts routinely reject a
competitor's Sections 349 and 350 claims if "the gravamen of the
complaint is . . . harm to plaintiff's business" rather than
harm to the public interest in New York at large.  Emergency
Enclosures, Inc. v. Nat'l Fire Adjustment Co., 893 N.Y.S.2d 414,
417-18 (App. Div. 2009) (citations omitted); see also Gucci Am.,
Inc. v. Duty Free Apparel, Ltd., 277 F. Supp. 2d 269, 273-74
(S.D.N.Y. 2003) (collecting cases).  The gravamen of Grand
Estates's GBL claims in this case is precisely limited to the
alleged damage to Grand Estates's business: Grand Estates claims
injury by Concierge's alleged false advertisements and deceptive
trade practices because these tactics allegedly gave Concierge
an unfair advantage in its competition with Grand Estates.  (Am.
Compl. ¶¶ 427, 443.)  In any event, as explained below, the GBL
claims of Grand Estates fail in the absence of allegations that
Concierge engaged in "consumer-oriented" conduct that affected
public interest at large.

Tower Apartment LLC v. Mark Hotel LLC, 853 F. Supp. 2d 386, 399
(S.D.N.Y. 2012); Exxonmobil Inter-Am., Inc. v. Advanced Info.
Eng'g Servs., Inc., 328 F. Supp. 2d 443, 449 (S.D.N.Y. 2004).
Courts evaluating whether a conduct is "consumer-oriented" have
generally focused on several factors, namely, "(i) the amounts
at stake, (ii) the nature of the contracts at issue, and (iii)
the sophistication of the parties." Fleisher v. Phoenix Life
Ins. Co., 858 F. Supp. 2d 290, 304 (S.D.N.Y. 2012) (citations
omitted). "None of these factors alone is dispositive. Rather,
these considerations as a whole are intended to ascertain
whether the disputed acts or practices have a broader impact on
consumers at large." Id. (internal citations and quotation
marks omitted).

In particular, "contracts that are not 'standard-issue,'
but are instead designed to provide services 'tailored to meet
the [plaintiff's] wishes and requirements' are not consumer-
oriented for § 349 purposes." Exxonmobil, 328 F. Supp. 2d at
449 (alteration in original) (quoting N.Y. Univ. v. Continental
Ins. Co., 662 N.E.2d 763, 770 (N.Y. 1995)). Instead, "[t]he
typical violation contemplated by the statute involves an
individual consumer who falls victim to misrepresentations made
by a seller of consumer goods usually by way of false and
misleading advertising." Genesco, 593 F. Supp. at 751; accord
Teller v. Bill Hayes, Ltd., 630 N.Y.S.2d 769, 773 (App. Div.

1995).

In this case, auctions of luxury real properties, which were valued at millions of dollars, involved complex arrangements between sophisticated parties and with tens of thousands of dollars in marketing costs alone.  As alleged in the Amended Complaint, each contract was entered into only after an elaborate process of pitching by the auctioneer and individualized negotiations between the auctioneer and the seller, which are wholly unlike the unsophisticated, day-to-day consumer transactions in the sales of consumer products and services.  (See, e.g., Am. Compl. ¶¶ 77-82, 116-31, 151-88).  Therefore, because of the large amounts of money involved in these complex transactions, and because these transactions provided services "tailored" to meet the sellers' individualized requirements, Exxonmobil, 328 F. Supp. 2d at 449, these contracts cannot be deemed as "consumer-oriented."  See 904 Tower Apartment, 853 F. Supp. 2d at 390, 399-400 (granting motion to dismiss and holding that a $ 10 million transaction involving the sale of two luxury apartments "is too unlike a typical consumer violation to be covered under the statute").[14]

_____

[14] The fact that the plaintiffs alleged multiple instances of similar transactions is of no consequence.  It is the nature of the underlying transactions that matters in the determination of whether a type of transactions is "consumer-oriented."  A transaction does not become "consumer-oriented" simply because the same defendant has done a similar type of business with

43

Therefore, the plaintiffs have failed to allege facts to show that the luxury real estate transactions in this case are the type of "consumer-oriented" transactions affecting consumers at large and thus cannot state a claim under Sections 349 and 350.  Additionally, the GBL claims of the Jarols fail because the claims failed to satisfy the territoriality requirement.  Accordingly, the defendants' motion to dismiss Counts V and VII is **granted**.[15]

---

multiple clients; otherwise, any business transaction could become "consumer-oriented," including those that have been held not to be so, such as selling luxury real estate.  See 904 Tower Apartment, 853 F. Supp. 2d at 390.

[15] The defendants dispute personal jurisdiction over defendants CA Partners, Segue, and BHI.  Because no claim remains against these defendants, it is unnecessary to reach that issue.

**CONCLUSION**

The Court has considered all of the arguments of the parties.  To the extent not specifically addressed above, the remaining arguments are either moot or without merit.  For the foregoing reasons, the defendants' motion to dismiss is **granted** except with respect to the claim under § 1962(c) by plaintiffs Deborah Jarol and Sherwin Jarol against defendants Brady and Russo, as to which the motion to dismiss is **denied.  The Clerk is directed to close Docket No. 10.**

SO ORDERED.

Dated:    New York, New York
          March 10, 2014                    _____/s/_____
                                              John G. Koeltl
                                      United States District Judge